B"H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Teman, Ari
*Plaintiff*

*v.*

The City of Miami Beach (as "MB"),
The City of Miami Beach Office of the City Attorney,

Miami Dade County

Nahum Joseph, an individual,
Yoe Lopez, an individual,
Woody Clermont, an individual,
Rafael Paz, an individual,

Mayor Daniel Gelber, an individual,
Vice Mayor Steven Meiner, an individual

Judge Kristy M. Nunez, an individual

*Defendants*

INDEX: 23-CV-_____

42 U.S.C. § 1983

COMPLAINT FOR CIVIL RIGHTS
VIOLATIONS AND CONSPIRACY
TO COMMIT CIVIL RIGHTS
VIOLATIONS

### <u>OVERVIEW</u>

1. For years, Miami Dade County, Miami Beach, the Miami Beach Office of the City Attorney, the Miami Beach Police, Miami Dade Police, and judges including Judge Kristy Nunez have conspired to deny public defenders to thousands of indigent defendants, using a dirty trick that is in violation of the Sixth and Fourteenth Amendments to the United States and a violation of the Florida Constitution.

2. As a result of the Defendants and their associates unconstitutional acts, 61% of misdemeanor defendants in Miami Dade county are not appointed a defense attorney! [1]

3. That is 40,402 defendants were not appointed counsel!

---

[1] https://eji.org/news/thousands-face-misdemeanor-charges-without-counsel-in-florida/

4.  Many of these defendants cannot speak or understand English fluently.

5.  Many defendants have been tricked into waiving jury trials.

6.  Many have been coerced to plead without being advised and not knowing it will result in deportation, in violation of *Padilla v. Commonwealth of Kentucky, 559 U.S. 356*, or loss of a job or child custody, or revocation of bond.

7.  All such defendants have been denied the resources that come with being assigned a Public Defender, such as the use of an investigator to look at and find weaknesses and lies in the Governments' witnesses' testimony.

8.  When the Office of the City Attorney and Miami Beach and the Miami Beach Police know they have a weak case, they stipulate to "no jail", whereupon judges dismiss public defenders or deny public defenders to defendants who cannot afford counsel.

9.  Their argument is legally baseless and fatally flawed logically, because a misdemeanor conviction can result in incarceration regardless of that case's lack of a jail sentence. For example, a defendant may be deported, or may have bond or probation revoked.

10. The Supreme Court of the United States (SCOTUS) has already made clear in Padilla v. Commonwealth of Kentucky, 559 U.S. 356, that criminal defense attorneys must advise noncitizen clients about the deportation risks of a guilty plea. The case extended the Supreme Court's prior decisions on criminal defendants' Sixth Amendment right to counsel to immigration consequences.

11. The same SCOTUS logic must apply to defendants who may be under Bond Pending Appeal, as the current plaintiff is in SDNY (see JusticeForAri.org for letters and videos from Harvard Law Professor  Lawrence Lessig and many of other legal experts and community leaders saying the case is a "legally baseless" "major injustice"; United States v. Teman (1:19-cr-00696)), or for those under probation or other similar circumstances.

12. No defendant in such a condition, or any condition, should be forced to face any criminal accusations without an experienced defense attorney to advise on potential consequences of pleas,

13. Furthermore, there are devastating possibilities for anyone accused and found guilty of a misdemeanor that extend far beyond any jail sentence, including loss of a job, reputation damage, child custody, being banned from entering other countries (which could divide someone from loved ones), and the like. The idea that stipulating to

"no jail" eliminates risk to the defendant such that they are no longer deserving of the Constitutional right to a qualified defense attorney is preposterous.

14. It is clear that the dirty trick is used to help less-than-excellent prosecutors, such as Defendants Nahum Joseph and his team win weak cases.

15. In the Plaintiff's case, Mr. Joseph and his team were presented with four (4) independent eye witnesses who issued written and video statements confirming that the Plaintiff did not touch anyone and was in-fact the victim of assault by individuals who then made a false police report *after* witnesses called an ambulance for the Plaintiff because he was badly bruised and injured by the Police's witnesses.

16. The Defendants were also provided evidence that the police conspired to hide a witness's existence because that witness was actively violating a restraining order and running aggressively in circles around the woman, his ex, who had the restraining order against him. That is the police hid that their witness, who appears to be one of the individuals who assaulted the plaintiff, had a restraining order and was actively and intentionally breaking the law to harass his ex!

17. Mr. Nahum and his team, as well as Mayor Dan Gelberg, an attorney, and Vice Mayor Steven Meiner, also an attorney, were all apprised on the situation and knew that their officers had violated the Constitution and *Brady*, and accidentally arrested the victim.

18. Rather than dismiss the case, they attempted to swindle the Plaintiff into taking a "Diversion" where he would take a class and the count would be wiped clean. However, this could have devastating effects on the Plaintiff's bond conditions in his SDNY matter.

19. The Defendants, Mr. Nahum and his team, the Mayor and Vice Mayor, and City Attorney Mr. Paz, were all made aware of the aforementioned facts.

20. Furthermore, they were all made aware by the four independent witnesses' statements that Mr. Teman was clearly standing up to protect elderly individuals and children from being run over by a stampede of CrossFit runners storming through a crowded cafe patio (despite the public sidewalk & street being right next to it), and is therefore immune from prosecution under Florida's "Stand Your Ground" laws.

21. The Defendants knew they do not have a case, and their only hope to win is to offer a terrible plea and failing that to deny the Plaintiff his constitutional right to counsel.

22. It is mindblowing that individuals who claim to be liberal and care about the rights of others would foster and facilitate a system for denying thousands of defendants' their constitutional right to counsel.

23. However, it is worse. Evidence will show that Miami Beach and Miami Dade and their law enforcement entities engage in an ongoing pattern of bribing judges and making gifts which should be counted as financial or in-kind contributions according to the FEC, FCC, and Florida Code of Judicial Conduct.

24. To wit, they endorse judges, and in the case of Defendant Judge Kristy Nunez, serve as her most active and prominent endorsers and appear with her for publicity purposes.

25. Defendant Judge Kristy Nunez's instagram page is so full of photos with her and Miami Dade and Miami Beach police officers, that one might mistake it for a fangirl page and not the social media of a judge who is required to be a neutral arbiter between those accused of crimes and law enforcement. There appear to be zero (0) photos on Judge Nunez' instagram with any defense attorney organizations, or civil rights or justice reform or alternative sentencing organizations, but she's got photos with an array of police departments, gleefully displays decorations she made for the State prosecutors office, and even has a fan photo of the police motorcycles.

26. No reasonable observer, as defined by Case Law, would look at Judge Nunez's instagram and believe she does not hold a strong pro-police bias.

27. This is an issue because the Plaintiff's case involves active obstruction of justice by the Miami Beach Police Officers and now Mr. Nahum and his office, who have refused to provide Body Worn Camera (BWC) footage, transcripts, or witness information, or any information at all as requested by the Plaintiff to prepare for his defense.

28. Defendants Miami Beach, Miami Dade, and their prosecutors (Defendants Nahum, etc.) and police officers no-doubt feel confident in obstructing justice *because they have literally bribed the judge repeatedly, as defined by the FEC, FTC, and Florida's Judicial Ethics Benchguide*, as will be explained and case law cited below.

29. As such, the Plaintiff is being denied his Constitutional right to the assistance of counsel, and to Brady evidence, and the Plaintiff has no means to access it via a neutral arbiter or the court.

30. Furthermore, the Defendants have not even provided information to the Defendant as to how to file motions, or seek evidence, or enter requests and records onto the docket. The fundamental acts required to defend oneself are being intentionally obfuscated and hidden from defendants, and not only the plaintiff, but as a matter of ongoing practice by the Defendants.

31. The Court also does not provide clear instructions for such defendants after being denied counsel. There is no apparent follow up. In A Zoom hearing that lasts f not more than a few minutes at best, with shoddy audio, a defendant is denied counsel after a "no jail" stipulation is made, and then *zero* instructions are given to the Plaintiff. No emails, not links to instructions, no forms or guides to requesting evidence held by the Government.

32. The Defendants are engaged in a Conspiracy to Deny the Constitutional Rights of the Plaintiff and all those similarly situated. Denying defendants the right to counsel is a violation of the fundamental rights afforded to all in the United States Constitution.

33. This case therefore seeks to restore those rights through declaratory and injunctive relief, and also seeks severe punitive damages against the individuals who have conspired to deny these basic rights to the most vulnerable among us.

34. To be clear, these Defendants are not making an accident, but are knowledgable and responsible for their intentional acts, which have deprived tens of thousands of people of their fundamental rightst. They are attorneys, trained and educated and experienced in the law. They have chosen to use their positions of power to deny the rights guaranteed by the Constitution to thousands, and they should be suspended from the practice of law for a significant period of time or forever, as the Court or Jury sees fit after presentation of evidence.

35. The right to counsel is so sacred, that all who are aware of this travesty of justice should do their utmost to ensure it is rapidly corrected and those who were denied their fundamental rights afforded the ability to repair the damage caused.

36. Lest the Court suggest that the Plaintiff could merely appeal the errors made by Defendant Nunez, that is not a viable solution because the Plaintiff is not trained, educated, or experienced enough to to know which issues to object-to and preserve for appeal. Thus, without counsel at every hearing, the Plaintiff will be irrevocably harmed, and has been already.

37. Furthermore, it should not be lost on anyone that this tactic to deny counsel to misdemeanor defendants is done as a "coercive plea bargaining" tactic. This is done through the intentional infliction of of emotional duress on defendants who may be, as the Plaintiff is, entirely innocent but who are lost in the system and hopeless without counsel. Or, as with other defendants who struggle to speak and understand English and/or to keep up with the fast-paced nature of a court such as Defendant Nunez's where an entire arraignment is given less than a few minutes, and there is no procedure to check for "Special Circumstances" where a "no jail" stipulation would not cause the denial of a public defender assignment. The lack of a regular procedure, consistently applied without bias or omission,  to always check for Special Circumstances (such as existing bond conditions or possibility of deportation) speaks to the intention of the Defendants' scheme and conspiracy -- they are not interested in justice, or even following the law as defined by SCOTUS in *Padilla*, but in intimidating and causing emotional duress to even innocent defendants so they will take plea deals.

38. The Constitution is worthless if we are not willing to stand up for it. In fact, it would be unethical to *not* sue these defendants for their flagrant violations of so many defendants' rights.

39. The Court and the Jury will surely see the grave injustice orchestrated by the Defendants against so many, including but not limited to the Plaintiff, and will issue injunctions and orders to restore the assignment of defense counsel to all defendants, just as our Great Nation's Founders intended.

40. One side being afforded city-funded counsel with millions of dollars of budget1 and investigators while the other side is denied it is not a fair trial.

41. One side being able to endorse and campaign politically for a judge, providing extremely valuable in-kind and financial assistance (it costs money to stage these appearances and events), and then to have the judge deny counsel to the other side is not a fair trial.

42. That this injustice has been allowed to continue for so long is an embarrassment to the great State of Florida, one of the top 50 states in the Nation, and the United States of America. This Court should please restore the right to counsel as it was intended and is understood by all, and issue strict punitive punishments to the defendants who have denied the rights of so many, including the plaintiff, so as to discourage any other municipalities from pursuing such an unjust strategy.

## JURISDICTION AND VENUE

43. This action arises under 42 U.S.C. § 1983, and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

44. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

45. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is diversity of citizenship between Plaintiff and Defendants.

46. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in Miami Beach, FL, which is located within the Southern District of Florida.

47. Venue is proper in this district pursuant to 28 U.S.C. § 1391, as well, because the majority of the Defendants reside in and/or operate in this district.

## PARTIES

1. Plaintiff Ari Teman is a resident of Miami Beach, Florida.

2. Defendant City of Miami Beach is a municipality located in Miami-Dade County, Florida.

3. Defendant Miami Dade County is a municipality located in this District.

4. Defendant Kristy Nunez is a County Criminal Court Judge for Florida's 11th Judicial Circuit, located in Miami-Dade County. She is sued in her official capacity for declaratory and injunctive relief. Upon information and belief, she is domiciled in the Southern District of Florida.

5. Defendant Miami Beach Mayor Dan Gelber, Esq, is sued in his official capacity for declaratory and injunctive relief. Upon information and belief, he is domiciled in the Southern District of Florida.

6. Defendant Miami Beach Vice Mayor & Commissioner Steven Meiner, Esq, is sued in his official capacity for declaratory and injunctive relief. Upon information and belief, he is domiciled in the Southern District of Florida.

## FACTS

7.   Plaintiff is a resident of Miami Beach with no history of violent acts, and a lifelong history of volunteering and service.

8.   Plaintiff is the founder of the JCorps International volunteer organization ( JCorps.org ) and was awarded the "North American Hero of the Year" award by the Jewish Federations of North America and "36 Under 36" by the Jewish week, and was an official guest of the Obama White House for his volunteer work.

9.   Plaintiff's volunteering continues until today, and he was also recognized by Mayor Grossman (Bal Harbour, FL) and the IDF for volunteering with survivors and families during the Surfside Collapse.

10.  Plaintiff pro-bono designed the new architecture for the local synagogue, and has met with the city boards and commissioner Meiner to help the city more effectively and efficiently install and maintain public art throughout the city.

11.  Plaintiff regularly hosts a free communal meal for young adults called "SoBeShabbat", of which even Miami Beach Attorney Benjamin Braun, who appears before this court (SDFL) has been a guest, as have many others. The goal of this meal is to help foster community and positive energy in South Beach, and all are welcome regardless of faith or background.

12.  Plaintiff is a regular, almost daily, customer at Cafe Umbria at 959 West Avenue, where he does a daily sketch drawing, writes comedy material (Plaintiff is a comedian), and plans his day.

13.  Because the Plaintiff is such a regular at the cafe, he has seen numerous occurrences where runners from a nearby "CrossFit" gym stampede at high speeds through a crowded cafe and have run into women, men, children, and pets on leashes, causing risk of great injury or death.



14.

(PHOTO: Screengrab of video showing a CrossFit Runner just after running into this woman. Rather than slow down or run on the sidewalk behind the railing (visible in screengrab), this runner decided to push the woman, as there was no room between the woman walking her dog and the chair next to her.)



15.

(Another example. Video screenshot. Runner turns the corner as a pedestrian is walking around the corner, but and looking in the other direction. By the time the runner clears the bushes there is no time to slow down or avoid collision. Note, that on weekends the foreground is far more crowded, and the ground is full of children and puppies playing.)



16. The runners then storm through the cafe in all directions. The green-marked area is where the Plaintiff's 12lb toy
    Australian Shepherd  puppy (ESA) was roaming around, tied to the table with a leash. A runner could have easily
    kicked the puppy or tripped on the leash and harmed the puppy, as this is not a running track or sidewalk but a

cafe full of chairs and people with low visibility and no expectation by the patrons and puppies that a stampede is about to happen!

17. The cafe is a corner property and the corner has bushes and trees such that a runner turning the corner at high speed cannot see a person exit the cafe, as the cafe door is right after the bush. At the same time, pedestrians and patrons walking in the other direction cannot see the runners, and also may be looking in another direction or on their phones and not see the runners. This has resulted in impacts at high speeds.

18. Pedestrians, often elderly, and staff often take this narrow turn without looking, or while pulling pets, carts, or baby strollers.





19. Such an impact to an elderly man or woman, or small child or pet, could result in severe bruising, injury, or death.

20. Plaintiff has repeatedly warned the cafe, the runners, and the landlord, verbally and in writing (email), that the potential for injury is great and signs should be placed.

21. Upon information and belief, the cafe owner has asked the CrossFit gym to cease the running through the cafe.

22. To be clear, there is a sidewalk next to the cafe, separated by a railing, which would protect the patrons. Some runners use it or run in the street, but most runners choose to stampede as a group through the crowded cafe.

23. It is inevitable that people will be impacted, as it happens frequently. On one Friday morning, April 7, 2023[2], in the span of about an hour, a woman, man, and dog were hit, and two staff members of the cafe were almost hit. This was captured on video and provided to the Defendants, who appear to have done nothing to mitigate the potential harm.

24. It is literally impossible for the runners to see through the bushes and therefore they cannot see if an elderly person, child, or pet is about to step in front of them. As shown above, those people are often not paying attention because it is not normal for an entire gym class of CrossFit thugs to storm a sidewalk.



25. It is often a relentless stampede, too, with no room for pedestrians to step aside to avoid impact:

_____

[2] Because some may notice this is the 2nd day of Passover, for the purposes of clarification to those who might care, Plaintiff lived in Israel and therefore observes one day of the first days of Passover as he would have in Israel, and not two as Jews do in the Diaspora, in accordance with many Rabbinic rulings. ("Many rule that such individuals can only observe the seven days (with the first and last days being the only strict days of observance").https://www.learnreligions.com/passover-observance-in-israel-2076482 ) Furthermore, recording evidence for the purposes of defeating an unjust criminal charge would be considered and would override restrictions on electronics use. *Pidyon Shvuyim*







 

26. As is clear from the photos, there is no room for a pedestrian to step aside and not enough time for them to do it --
    all those screengrabs are from less than 55 seconds of video. Someone walking out of the cafe and looking at their
    drink (so as not to spill, for example) or their phone (as many do) or tending to a child in stroller, would not think
    that they need to "look both ways" on a cafe patio for high-speed runners! Someone is going to get hit, and
    in-fact, as shown above, people frequently are hit by these runners.

27. Multiple witnesses have issued statements in writing and video, attached (the written statement and transcripts),
    which show that Plaintiff Ari Teman did not touch anyone, but warned the runners that they'd almost hit an elderly
    man and to run on the sidewalk instead.

28. Witness Daniel M_ (name redacted for his privacy), whose statement is attached, writes:

    a.   "Ari [Teman] did not touch anyone at any time" , and

    b.   "Instead, the runners ran directly into him [Teman] grabbed him and the chairs, and a man in a gray t-shirt
         pushed him out of the way forcefully." and

    c.   "I then saw a man in red shorts, no shirt, and with tattoos, charge into Ari just by the Pura Vida. It was a
         very forceful body slam.": [The man in red shorts appears to be Jesse Kats who gave the police a
         statement]

29. Eduardo, barista at the Cafe, on Video, says about Teman, "he did not touch anybody":

a. https://www.dropbox.com/s/nug7z3qdxwj5wik/Umbria_Edquardo_Statement_Ari_Did_Not_Touch_anyo ne.mp4?dl=0

30. Additional witnesses who worked at Cafe Umbria confirmed on video that they saw Mr. Jesse Kats attack Teman unprovoked:

a. https://www.dropbox.com/s/t2hrffu6vt7qmts/myke_fatima_statement_kats_attacked_teman_unprovoked. mp4?dl=0

b. Note that in that video it is Teman who says he will make a police report. Only after this do the Govt's witnesses go to call 911 and issue demonstrably false statements.

31. Teman moved two chairs before the corner turn to slow the runners so they would not blindly run into an elderly person exiting the cafe or turning the corner in the opposite direction, but did not remove his hands from the chairs and did not touch anyone.

32. As noted, multiple independent witnesses, with no relation to Teman or each other, confirmed that Teman did not remove his hands from the chairs and did not touch anyone. Multiple witnesses confirmed that Mr. Teman was assaulted by the runners, including being struck and grabbed. Witness statements confirm that Mr. Teman ran ahead of the runners and took their photo, but did not touch them at any time. The Defendants are in possession of these witness statements.

33. Mr. Teman was very clearly exercising the desired behavior under Florida "Stand Your Ground" laws which encourages citizens to protect themselves and others from likely injury or death. As such Mr. Teman is immune from prosecution.

34. One runner, who assaulted Mr. Teman in the chest with extreme force while running, gave Mr. Teman the middle finger, aka the "bird". He is shown here:



35. Upon information and belief, this man in the gray t-shirt ("Gray T-Shirt Guy") or an associate of his has an active restraining order against him by a woman whom he was running loops around and who took a photo of him.

36. The police discussed this in the Emergency Room where Mr. Teman was being treated for injuries and visible bruising after the cafe staff called an ambulance for Mr. Teman and Mr. Teman called Hatzalah.

37. A Medical Doctor (MD) volunteering for Hatzalah determined that Mr. Teman needed to be taken to the Emergency Room and given a CT scan because of the extreme impact on Mr. Teman's neck, jaw, head, and shoulders by a Mr. Jesse Kats, a CrossFit Runner.

38. The Police Officers discussed with each other and their supervisor via radio, while a police BWC (Body Worn Camera) was running, that this individual had a restraining order against him by a woman who took his photo at the scene. This means, obviously, that this individual who had run *multiple loops through that patio and area* was willfully violating a restraining order. The police also discussed that he was running with his "new girlfriend".

39. Such information is obviously "Brady" as these individuals who were actively breaking the law and intimidating a woman who felt she needed the protection of a restraining order suddenly striking Mr. Teman is far more

believable given that information that they were *already* actively involved in instigating conflict with others and breaking the law. A jury would surely look at those two witnesses and their group differently.

40. Thus, the police choosing to leave these individuals off the arrest report and hide their existence and identity *and their concurrent violation of a restraining order*, is obviously not only impeachment evidence of the runner's character but of the police and law enforcement. They willfully hid exculpatory evidence!

41. However, Mr. Nahum Joseph, Mr. Rafael Paz, and their co-defendants Mr. Woody Clermont and Mr. Yoe Lopez, have all ignored requests to be provided this information by the Plaintiff, despite *Brady* being an obligation.

42. Miami Beach Mayor Dan Gelber and Vice Mayor Steven Meiner, both attorneys, have also ignored requests for this information.

43. It is common knowledge that Brady is an obligation and that police and municipalities are not allowed to conspire to hide exculpatory evidence.

44. It is also common knowledge to all Florida attorneys and politicians that Florida Stand Your Ground laws protect individuals who intend to protect themselves and others from imminent harm and/or death. Thus, it is common knowledge to the Mayor and Vice Mayor that Mr. Teman may not be prosecuted for standing up to prevent runners from stampeding into elderly patrons.

45. Again, as shown above, it is not even a *hypothetical* that the runners will hit people. They hit them frequently, and it is obvious that if the person they hit is elderly and frail or young or tiny tha person could be killed.

46. The witness statements provided to the Defendants by Mr. Teman also confirm that Mr. Teman was very vocal and clearly shouting that the runners had almost hit someone and to run on the sidewalk lest they injure an elderly man or woman or child.

47. The Defendants know full well that they do not have a right under Florida law to prosecute Mr. Teman and thus they conspired to deny Mr. Teman's right to counsel.

48. The Defendants have an ongoing and organized scheme to deny defendants' he right to counsel in cases where even a "no jail stipulation" could result in extreme punishments such as deportation, deprivation of travel rights into other countries (keeping criminal defendants from loved ones for life!), termination or denial of employment, or the like.

49. The Defendants run a shoddy system where the prosecutor and judge cannot even be clearly heard, and less than one minute is given to *multiple defendants (literally multiple defendants in under ONE MINUTE!!!!)* to be arraigned. Given the shoddy sound and the multiple languages spoken by defendants, and many accents common in South Florida it is inevitable that defendants will accidentally waive rights.

50. To be clear, Mr. Teman demanded a jury trial and also demanded to be assigned counsel.

51. Mr. Teman is in severe debt as he is the defendant in a case legal experts including Harvard Law School Professor Lawrence Lessig, entirely pro-bono call a "Major Injustice" (see video and letters from Professor Lessig and others at JusticeForAri.org ), and cannot afford to pay counsel. Defendant Meiner and Gelber and their co-defendants know this and are taking advantage of it by trying to deny Teman counsel.

52. Because the police willfully obstructed justice and hid the name of a witness (who may also be an assailant), an investigator is needed to identify this individual's connections to other parties, and to the police. The Public Defender's office is able to assign this and can afford it. It is clear the Defendants conspired to deny counsel to Mr. Teman to deny this possibility.

53. However, their basis, which is that Teman is facing "no jail" for this case even if convicted despite being innocent, is false. Mr. Teman is under Bond Pending Appeal in SDNY Federal District Court, and his bond could be modified or his sentence, based on a misdemeanor conviction, could include incarceration as a result. Thus, Mr. Teman is in fact facing potential jail from this, and should be afforded the right to counsel and to a full investigation.

54. Defendant Judge Nunez is one of the few criminal court judges in Miami-Dade County Court who removes public defenders based solely on the certification that the State will not seek jail time.

55. Defendant Nunez removes counsel without any independent review of the case or individual circumstances, or of whether removing counsel would prejudice the defendant. Thus, indigent defendants have been frequently stripped of public defenders that have spent weeks, even months, preparing a case.

56. Nunez's practice allows prosecutors to control the right to counsel for indigent misdemeanor defendants.

57. Defendants' maintenance and enforcement of these convictions result in severe collateral consequences. Especially for indigent defendants, the consequences of conviction are often more debilitating than a modest jail

sentence. These consequences include immigration detention and/or deportation, or the loss of a job, home, custody of children, public benefits, professional licenses, driver's licenses, and more. Depending on the defendant's financial circumstances, the fine may expose them to jailing for nonpayment.

58. By contrast, wealthier defendants who can afford to retain a private attorney enjoy the assistance of counsel until the conclusion of their case.

59. Indigent defendants have a right to counsel on appeal under Florida law, regardless of whether they were incarcerated upon conviction. Yet indigent defendants at trial are not guaranteed the assistance of counsel if they do not face incarceration, rendering any appeal of an uncounseled conviction a meaningless ritual because counsel is unavailable to preserve appellate issues at trial and to advise the defendant about the right to appeal

60. Plaintiff is too poor to afford private counsel and faces numerous collateral consequences as a result of conviction. Plaintiff has a right to counsel to defend him.

61. Plaintiff was charged with a non-petty offense. Plaintiff has a right to a jury trial and a right to counsel to prepare for trial and to engage in plea negotiations with the prosecution.

62. At the time Defendant Nunez discharged Plaintiff's public defender, defense counsel (Mr. Ramie Altawil, a Public Defender) had done substantial preparation on Mr. Teman's behalf, including guidling Mr. Teman to prepare for the arraignment, and to demand a jury and a public defender.

63. Following Defendant Nunez's discharge of the public defender, Mr. Teman cannot adequately represent himself. For instance, he did does understand how to pursue discovery from the prosecution -- and the prosecution seems to be eager to avoid discovery requests sought by email and has ignored them for weeks, and does not know how he can seek to depose state witnesses, especially given these witnesses assaulted Mr. Teman and then filed a false police report to have Mr. Teman false arrested -- as confirmed by four independent witnesses!

64. Accordingly, Defendant Nunez's discharge of the public defender who had already done substantial work Plaintiff's case violates Plaintiff's right to counsel under the Sixth and Fourteenth Amendments.

65. Meiner confirmed in writing, "I have been actively involved in our municipal prosecution program from a policy perspective". It is policy to cheat tens of thousands of defendants, including Plaintiff, out of a public defender.

66. The Defendants' actions were willful, malicious, and in violation of the Plaintiff's civil rights.

**THE COUNTY AND CITY, AND THEIR LAW ENFORCEMENT AGENCIES ARE ENGAGED IN BRIBERY OF THE LOCAL JUDGES, INCLUDING DEFENDANT Kristy NUNEZ, IN VIOLATION OF THE LAW AND FLORIDA JUDICIAL CODE**

66. Defendants Miami Dade, Miami Beach, and their law enforcement agencies and support organizations ("PBA" types) are engaged in a scheme to bribe judges including Defendant Nunez.

67. According to Federal and Florida State laws, the endorsements and appearances by these law enforcement agencies of Judge Nunez, and her use of these for campaigning and self-promotion, violate the ethical and legal guidelines set by the Federal and State Governments.

68. The Plaintiff will bring experts on Election Law and Funding to support this, but cites publicly available sources for now:

69. According to the FEC, endorsements by organizations are considered "in-kind" donations, at least, and may be considered financial donations. The FEC states clearly, "A corporation or labor organization may endorse a candidate and may communicate the endorsement to the general public. The corporation or labor organization may communicate with candidates for the purpose of deciding which, if any, candidate to endorse. For example, the corporation or labor organization may discuss issues with the candidate in determining whether or not to make an endorsement. **However, the corporation or labor organization may not coordinate the announcement of its public endorsement with any candidate, candidate committee or its agents without the endorsement resulting in a contribution or expenditure**" (

https://www.fec.gov/help-candidates-and-committees/making-disbursements-ssf-or-connected-organization/endorsing-candidates-corporation-labor-organization/ ).

70. The police appearing together with the judge for publicity photos, and coordinating the advertisement and placement of logos and flyers online and in print publications, as well as the coordination of events such as design competitions, galas, and charity events, all cross the line from "discuss issues" to "coordinate the announcement of its public endorsement". These expensive events, which use the time of the police (labor costs), fuel,

transportation, media teams, and the like, are all "contributions" and, obviously, "**expenditures**". They constitute monetary gifts to a judge or judicial candidate.

71. Florida's *Judicial Ethics Benchguide* is even less forgiving of the coordinated appearances, media, and promotion between the Defendants and Defendant Judge Nunez. To wit, it states, "A judges website may not be used … to cast reasonable doubt as to the Judge's ability to act impartially as a judge." (Page 85) As well, "A judge's personal website may not be used to solicit campaign support or contributions." (Ibid). Defendant Nunez' Instagram ( instagram.com/JudgeKristyNunez ) is a self-promotion effort which relies heavily on photos with police, images supporting police and prosecutors, and endorsements of and by the police.

72. The Benchguide also says, "A judge may not give a private educational presentation to the summer law clerks of the judge's former law firm. Option 15-06 (it would give appearance of judge maintaining close ties with that firm, and it would be impossible for judge to provide same educational opportunities to any law firm that might make similar request)." (Ibid. Page 89) Here the judge is giving exactly these types of presentations to select groups of Police, and not public defenders or defense counsel. The same logic that applies to a law firm should apply to any group or party regularly appearing before the Court, including the police.

73. Any juror who might Google (or otherwise search) the judge before or during a trial would understandably believe the Judge favors and trusts the police -- which would put a defendant at great disadvantage in convincing jurors that those same police conspired to hide evidence and falsify their statements and arrest report. A judge's social media and personal websites (which surely can be understood to include their Instagram feeds) should not be a public love affair between them and the police.

74. By the same token, a judge who had an anti-police and solely pro-defendant Instagram would also be seen as unfairly biased.

75. However, the fawning of the Police by Defendant Nunez is troubling when she rapidly denies counsel to anyone in her courtroom who is in opposition to them. Automatically ruling for the Police's side and denying a fundamental right to counsel takes on an even more distasteful tone when combined with photos such as these:



76.

A 9x9 grid view of Judge Nunez's Instagram is 100% devoted to police appearances and mutual support

(Screenshot taken: 4/9/23)





**139 likes**

**judgekristynunez** Today at the @miamidadecourts
Richard E. Gerstein Building, I had the pleasure of
hosting law enforcement officers from Mexico, who
have been attending a two-week course on
gender-based violence hosted by the @miamidadepd
and @miamipdtraining. It was a wonderful
opportunity to #teach and discuss the United States
legal system, the criminal court process, and the role
of an officer in cases specifically dealing with
gender-based violence. I hope today's presentation
was insightful in learning how to navigate these very
important cases in and out of court. #MiamiJudges
#MDPD #Training #GenderBasedViolence

77. The State Attorney's Office is literally including the judge in Arts & Crafts projects and she's promoting it:



78. There are fan posts praising Law Enforcement but zero about Public Defenders or Civil Rights Counsel



79. Judge Nunez is such a fan of the police that she even gets her religious encouragement and follows a Church called, "Officer of the Law" who displays a law enforcement badge!



80. The Officer of the Lord's website  ( http://www.officerofthelord.com/ ) states: "Officer of the Lord Ministries (OTL) was founded by Sgt. Jorge Diaz, a Christian **police officer** with over 29 years of experience in law enforcement."

81. While this law enforcement theme of the " Officer of the Lord", and the Judge's affinity for all things law enforcement, has already been sufficiently established, the Plaintiff would be remiss to not share in the joy of knowing that the " Officer of the Lord" holds or held "Spiritual Training (Church)" at a Dunkin' Donuts:



82.

Source: https://www.facebook.com/events/2109905042663589/2109905052663588/

83. Everyone has the right in this nation to worship and connect with God as they choose, but if someone is connecting to God via a Police Officer *at a Dunkin Donuts*, then maybe they're not the most neutral arbiter to decide disputes between the police accused of obstructing justice and defendants.

84. In this context, understanding the rather extreme public affinity and promotion and following of Police Officers and their content and events, the automatic rejection of defendants' rights to counsel by Defendant Nunez speaks to a scheme and conspiracy and not a decision guided by Constitutional law or legal ethics.

85. In fact, surely it cannot be argued that it is in accordance with the Constitution in spirit or law to deny defendants the right to counsel when it might result in them being caged or deported or terminated from employment or losing their children, or other devastating effects. It is not only against the basic fundamental understanding every citizen has of the Constitution, but it is against SCOTUS' ruling in *Padilla v Kentucky*.

86. A jury will see clearly that Judge Nunez sees herself as on the same team as the Police and Prosecutors, and not as a neutral arbiter. This is sufficient to establish that her joining in the scheme of her co-Defendants to deny counsel to the indigent is not an independent decision but one bought and paid for by in-kind and other contributions by her co-defendants, and her dependency on them for campaign purposes, communal participation, and social media dopamine hits.

87. For the above reasons it is clear the Defendants are engaged in an unconstitutional scheme and conspiracy to defraud indigent misdemeanor defendants out of their Constitutional Right to a public defender and advice of counsel at every hearing.

## CAUSES OF ACTION

## COUNT I: VIOLATION OF DUE PROCESS UNDER 6TH and 14TH AMENDMENT (Right to Counsel, Right to Due Process, and Equal Protection)

88. Plaintiff repeats and incorporates each of its prior allegations and all prior paragraphs as if repeated in full herein.

89. The right to counsel in criminal proceedings is guaranteed by the Sixth Amendment to the United States Constitution.

90. It is also guaranteed in Article I, Section 16 of the Florida Constitution:

91. "In all criminal prosecutions the accused shall, upon demand, be informed of the nature and cause of the accusation, and shall be furnished a copy of the charges, and shall have the right to have compulsory process for witnesses, to confront at trial adverse witnesses, to be heard in person, by counsel or both, and to have a speedy and public trial by impartial jury in the county where the crime was committed."

92. There are no exceptions in the Federal or State constitutions based on possible jail time or lack thereof. Furthermore, because any conviction could impact other legal proceedings, current, past (bond conditions, for example), or future (other false or true accusations), no criminal procedure should be tried without a competent defense attorney.

93. The Plaintiff here is entitled to a defense attorney provided by Miami Beach and Miami Dade County because any conviction could have serious impact on his finances, credit, reputation, and freedom if it affects any other bond conditions in other courts.

94. In this case, the Plaintiff's potential conviction could have serious consequences on his finances, credit, reputation, and freedom if it affects any other bond conditions in other courts, including in *United States v Teman (SDNY)*. Therefore, the Plaintiff argues that there are "special circumstances" that make counsel necessary to ensure a fair trial.

95. Moreover, in Gideon v. Wainwright, 372 U.S. 335 (1963), the Supreme Court held that the Sixth Amendment right to counsel extends to all criminal defendants who are unable to afford an attorney.

96. This includes cases where imprisonment is not a possible punishment. Florida courts have also recognized that a defendant is entitled to appointed counsel in misdemeanor cases where there is a possibility of incarceration or where the defendant's ability to present a defense would be significantly impaired without counsel.

97. Cite case law: Gideon v. Wainwright, 372 U.S. 335 (1963); Argersinger v. Hamlin, 407 U.S. 25 (1972); Scott v. Illinois, 440 U.S. 367 (1979); Powell v. Alabama, 287 U.S. 45 (1932); State v. Cruz, 776 So. 2d 356 (Fla. 2000).

98. A Public Defendant appointment also affords the defendant the ability to have an investigator. It is obviously unfair to have one party have attorneys and a budget for investigators, police, and research assistants or paralegals and the other side have absolutely no assistance and no budget for defense.

99. A misdemeanor conviction could have impacts on jobs, venture fundraising, community and organizational participation, volunteer opportunities (especially where the alleged misdemeanor is a violent act, battery), parental rights, credibility, public reputation, and in many other areas of life. A literal cage is not the only confinement caused by a conviction.

100. Furthermore, Miami Dade is clearly engaged in a scheme to defraud defendants out of fair trials, pushing them to plead with a dirty and unconstitutional tactic denying them counsel, often in the face of complicated and fast-paced hearings. In one study, " In Miami-Dade, public defenders were appointed in 39% of 66,234 cases." ( https://eji.org/news/thousands-face-misdemeanor-charges-without-counsel-in-florida/ ,

https://www.miaminewtimes.com/news/two-florida-laws-keep-public-defenders-out-of-misdemeanor-courtrooms-11309207   )

101.     It is barbaric that 61% of defendants are denied counsel, and surely a racist and bigoted position -- one Miami

Dade would not fathom if the defendants were upper middle class white people. Poverty cannot be a justification

for denying the rights of 61% of defendants to have competent and experienced legal representation. What Miami

Dade has is not a justice system, that's slavery with a new brand name.

102.     Furthermore, the process for deciding whether a defendant is entitled to an attorney at the first arraignment

hearing is disorganized and unconstitutional. A defendant who is not represented, by definition, cannot know all

the legal reasons and case they should be entitled to counsel, and is surely not expecting to be denied their request,

because as everyone knows, the United States Constitution guarantees the right to counsel in all criminal cases.

103.     Without conceding that it is constitutional or ethical (Lawyers, including judges are required to act ethically)

to deny someone counsel if they aren't facing a jail sentence in a criminal matter, the process for deciding that is

itself flawed. For example, someone on bond pending appeal in a Federal Matter, as the Plaintiff is, or someone on

probation, might be taken back to prison or jail if they lose a misdemeanor trial even though that trial was not

seeking incarceration. No court could know this without asking, and even if they did ask, it is possible there are

unknown cases or warrants outstanding, not even known to the criminal defendant, where a misdemeanor

conviction in Miami Dade would result in compounding sentences or denial of bond. These are additional reasons

why a defendant should always be afforded a Public Defender in any and all criminal proceedings.

104.     There are others. A defendant might be denied entry to another country if they have a conviction for

misdemeanor battery, for example. That defendant might be fully innocent (as the Plaintiff is, according to four

independent witnesses whose statements are attached and linked to this complaint), but might lose on a

technicality, such as one which prevents exculpatory evidence from being provided.

105.     For this reason, the Plaintiff is entitled to a Public Defender. Plaintiff seeks an order forcing Miami Beach to

provide a public defender, and any and all funding, equal to or greater than the amount of funding Miami Beach

has spent and will spend prosecuting this case.

106.    Plaintiff also seeks an order requiring Miami Beach and Miami Dade to provide Public Defenders for any and all criminal defendants regardless of potential jail sentence or not.

## COUNT II: Fourteenth Amendment Right to Due Process and Equal Protection
## Claim for Injunction or Order for Defendants to Obey Discovery Obligations, including compliance with *Brady, Jenks, and Giglio*:

107.    Plaintiff repeats and incorporates each of its prior allegations and all prior paragraphs as if repeated in full herein.

108.    Defendants are conspiring to deprive Plaintiff of a fair trial by willfully hiding evidence that could have been used to impeach a witness. By withholding this evidence, Defendants violated Plaintiff's constitutional right to due process.

109.    The attorneys for Miami Beach have refused to provide the defendant with Brady material, including but not limited to Police Worn Camera footage of the police discussing leaving out a witness because that witness had an active restraining order against him and was violating it at the time, running loops around the woman who had it. Upon information and belief, this witness is also the man in the gray shirt who assaulted the Plaintiff, as alleged in the attached witness statements.

110.    Obviously, evidence that the arresting police officers conspired to hide exculpatory and/or impeachment evidence, and did so to protect the alleged assailant, is relevant, as it is the Plaintiff's contention ( backed by four independent witnesses!) that the Plaintiff did not assault anyone and was in-fact the victim of assault by a group of runners who repeatedly stampeded through a crowded patio where they have hit people and animals.

111.    As the witness statements attached show, the Plaintiff did not touch anyone and merely moved some chairs before a corner so runners would slow down and not barrel into elderly patrons and children and pets at or in a crowded cafe.

112.    There is literally no reason for people in a CrossFit fitness class to take a shortcut that saves them less than 10 feet of running and endangers dozens of elderly people, children, and pets! There is no argument that justifies the

runner's behavior, and there are many people who have asked them to stop storming this crowded patio. In fact it is obviously grossly negligent behavior that endangers many people!

113.    As the following photos show, there is not enough room for two people and anyone exiting or entering the cafe would be hit by a runner. An elderly person hit by a 200-pound bodybuilding running at high speed could suffer broken bones, severe bruising, or death.

114.    As multiple witnesses stated in writing and on video, the Plaintiff stood up to protect these elderly patrons and the animals on the patio (including his 12-pound ESA toy Australian Shepherd, seen below) from being run over by thugs who could have and should have run on the adjacent sidewalk.

115.    The multiple witness statements confirm the plaintiff was shouting exactly this, to run on the sidewalk because they'd almost hit an elderly man and were endangering people.

116.    Thus, one of the runners who was willfully and repeatedly endangering the elderly and children also having a restraining order against him which he was violating at the same time, and likely also being the individual in the gray t-shirt who assaulted the Plaintiff, is obviously Brady information.

117.    It is apparent that Mr. Nahum Joseph and his office are pursuing a corrupt and baseless prosecution to protect police officers who deserve a Federal Civil Rights suit for evidence tampering.

118.    Regardless of all the above, a defendant is entitled to all exculpatory and impeachment evidence, and any such evidence that might be considered exculpatory or impeachment evidence.

119.    Furthermore, the defendant is entitled to the BWC footage, the 911 call transcript and recording, the names of all witnesses, the misconduct history of the police officers, communications with other members of the Miami Beach government, and any and all information which might help the defendant win at trial, establishing reasonable doubt.

120.    The Plaintiff seeks an injunction forcing Mr. Nahum Joseph, Mr. Rafael Paz, and the Miami Beach Prosecutors Office to provide any and all information sought by the defendant which may be considered exculpatory evidence, including but not limited to the information listed in the prior paragraph.

## CLAIM III: Injunction or Order for Defendants to Obey Florida's Stand Your Ground Law:

121.    Plaintiff repeats and incorporates each of its prior allegations and all prior paragraphs as if repeated in full herein.

122.    The Plaintiff argues that he is immune from prosecution under Florida's Stand Your Ground law. The law provides that a person who reasonably believes that he or she is in imminent danger of death or great bodily harm may use even deadly force to defend himself or herself. If the person uses force in this situation, he or she is immune from criminal prosecution and civil action.

123.    The evidence available to Mr. Nahum and his office, including the attached witness statements, establishes beyond a doubt that the Plaintiff was trying to stop runners from charging around a blind corner into elderly patrons and children. The Plaintiff would have been justified in using force to protect himself and others from harm. Therefore, the Plaintiff is immune from prosecution under Florida's Stand Your Ground law.

124.    The prosecutors are obligated to follow Florida's Stand Your Ground law and thus the Plaintiff seeks an injunction ordering them to do so.

125.    Failure to do so would result in a violation of the Plaintiff's constitutional rights, as well as a violation of the law.

126.    Cite case law: Florida Statutes § 776.012; Peterson v. State, 983 So. 2d 27 (Fla. 4th DCA 2008); Mobley v. State, 124 So. 3d 1072 (Fla. 1st DCA 2013).

127.    As well, even if the Defendants were to argue that Plaintiff is not immune under Stand Your Ground laws, this would be a complex constitutional argument for which the Plaintiff should be entitled to counsel.

128.    The Plaintiff seeks injunctive relief ordering the prosecutors to obey Florida's Stand Your Ground law and cease any and all prosecution of the plaintiff for actions to stop runners from endangering the elderly and children on a crowded patio.

129.    Because the Plaintiff is Immune from Prosecution under Stand Your Ground, Prosecution is not within the scope of the city attorneys' roles, they are not immune from litigation as individuals.

130.    As well, because denying a defendant the right to counsel is not within the scope of a prosecutor's role, they are not immune from litigation as individuals.

131.    Plaintiff therefore seeks an injunction against the individual attorneys ordering them to obey Florida Stand Your Ground laws and to cease any and all prosecution of the Defendant.

132.    Plaintiff therefore seeks an injunction against the individual attorneys ordering them to agree to any indigent defendant's request for a public defender, and to proactively inform any and all judges before whom they appear that they join the defendant in any request to be provided counsel.

## CLAIM IV:   Count I: Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1985

133.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 11 as if fully set forth herein.

134.    Defendants conspired to deny indigent defendants their right to counsel in misdemeanor trials where the city prosecutors stipulate to "no jail" sentences, resulting in judges denying defendants, including the Plaintiff, the right to be assigned a public defender.

135.    Defendants' conspiracy was motivated by a racial, class-based animus against indigent defendants.

136.    Defendants' actions violated the Plaintiff's civil rights under 42 U.S.C. § 1985.

137.    As a result of Defendants' conspiracy, Plaintiff suffered harm, including the deprivation of his Sixth Amendment right to counsel.

138.    Defendants' actions were willful, malicious, and in violation of Plaintiff's civil rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants as follows:

1.  An injunction or order ordering the Miami Beach Police to provide a public defender, or in the alternative, to cover the full costs of Mr. Teman hiring the defense counsel or firm of his choice.

2.  An injunction or order ordering Mr. Nahum, Mr. Lopez, and Mr. Clermont, and anyone at the Miami Beach Office of the City Attorney  to reply to Mr. Teman's (and/or Mr. Teman's counsels') requests  for evidence within 24 hours of the request, and to either provide the information requested or a detailed explanation of why that evidence will not be provided together with Case Law citations supporting the denial of the request.

3.  An order requiring the Mr. Nahum, Mr. Lopez, and Mr. Clermont, and the Miami Beach Office of the City Attorney to provide Mr. Teman with (a) the full and unredacted police body camera recordings and transcripts related to the misdemeanor case, (b) full and unredacted histories of any and all misconduct complaints against

any and all police officers or staff involved in the misdemeanor case, (c) full and unredacted copies of the restraining order and court transcripts related to the restraining order held against the witness the police left out of the police report, (d) all non-privileged emails, messages, documents, transcripts, recordings, photographs, videos, texts, chats, and any and all content related-to or regarding the misdemeanor case, (e) full and unredacted civil and criminal court histories and any and all parties involved in the misdemeanor case, (f) and and all potential impeachment evidence related to the misdemeanor case with the caveat that the Government should err on the side of providing the information if it might be considered impeachment evidence by the Plaintiff.

4. An injunction or order ordering Miami Beach Office of the City Attorney to dismiss with prejudice any and all counts where witnesses have made statements that Mr. Teman was acting to defend others of himself or his property from harm by the runners.

5. An order against the Miami Dade Clerk requiring them to notify in English, Spanish, and French, with additional translations available online, that a "no jail" sentence given by plea could have implications on a person's freedom, immigration, employment, and the like, in clear language.

6. An order against the Miami Dade County and Miami Beach requiring them to fund defense counsel equally to the amount they spend on prosecutors, and to assign counsel to all defendants prior to any arraignment hearings.

7. An order suspending Mr. Joseph, Mr. Paz, Mr. Clermont, Mr. Lopez, Mayor Mr. Gelber, and Vice Mayor Mr. Meiner from the practice of law for a period of 36 months, or longer, for willfully obstructing justice and violating Brady obligations, as well as for violations of Florida's Stand Your Ground Laws.

   This is warranted because of the sociopathic ease with which these individuals have pushed so many indigent defendants into pleas and sentences which will deny their ability to earn a living and uproot them from their homes and families. The very icon of justice in the United States is a balanced scale and these individuals have put a heavy thumb down on the side of the government denying fair trials to thousands of poor people. A strong example which strikes fear into other prosecutors and municipal leaders to not deny the rights of defendants is warranted and would be just.

8. Order Defendant Miami Dade and Miami Beach to end the practice of charging a fee ($50 or otherwise) to be assigned counsel. This fee is designed to be a barrier to prevent indigent defendants from exercising their right to counsel and is unconstitutional.

9. Compensatory damages against defendants in an amount to be determined by the jury, as appropriate, and no less than $75,000;

10. Punitive damages against defendants in an amount to be determined by the jury, as appropriate, and no less than $50,000,000 so as to discourage them from conspiring to violate the civil rights of defendants in the future;

11. Grant or award any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

APRIL 10, 2023
(19th of Nisan, 5783; Passover V)

Ari B. Teman
Plaintiff, Pro Se
Miami Beach, FL
781-718-3375
ari@teman.com

Disclaimers:      Plaintiff was assisted in Drafting this complaint by ChatGPT (OpenAI), an artificial intelligence service.

In accordance with ethics guidelines, Plaintiff discloses that he was also assisted by attorneys for the Partnership for Justice ( https://www.partnersforjustice.org/ ), appellate counsel in *US v Teman*, and by the prior filings and research of Attorney Brandon Buskey of the ACLU. These attorneys offered pointers to case law, but did not review the final submitted draft of this complaint.

It is expected and likely that Plaintiff will request the volunteer assistance of counsel who may amend this complaint and seek class action status to defend and secure the rights of the tens of thousands of individuals whom the Defendants have denied counsel and harmed in doing so.